IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Craig B. Shaffer

Civil Action No. 06-cv-01620-CBS-KMT

JANOS TOEVS,
        Plaintiff,
v.

LARRY REID,
SGT. MORRIS,
LT. TROXEL,
CASE MANAGER KRISTY MOORE, and
EXECUTIVE DIRECTOR JOE ORTIZ,
        Defendants.
_____

MEMORANDUM OPINION AND ORDER
_____

This civil action comes before the court on the "State Defendants' Motion to

Dismiss or for Summary Judgment" (filed July 31, 2008) (doc. # 81).  On May 9, 2008,

the above-captioned case was referred to Magistrate Judge Craig B. Shaffer to handle

all dispositive matters including trial and entry of a final judgment in accordance with 28

U.S.C. 636(c), Fed. R. Civ. P. 73, and D.C. COLO. LCivR 72.2.  (*See* doc. # 62).  The

court has reviewed the Motion, Mr. Toevs' Response (filed August 12, 2008) (doc. #

88), Defendants' Reply (filed August 27, 2008) (doc. # 90), Mr. Toevs' "Response to

Reply in Support" ("Surreply") (filed September 15, 2008) (doc. # 91), the pleadings, the

exhibits and affidavits, and the entire case file and is sufficiently advised in the

premises.

I.     Statement of the Case

Mr. Toevs is incarcerated at the Centennial Correctional Facility ("CCF") in

Canon City, Colorado.  (*See* doc. # 7 at p. 2 of 28).  Proceeding *pro se*, Mr. Toevs filed

his initial Complaint in this civil action on or about August 16, 2006.  (*See* doc. # 3).  At

the court's direction (*see* doc. # 6), Mr. Toevs filed his Amended Complaint on

November 16, 2006.  (*See* doc. # 7).  On January 5, 2007, the court dismissed this

action for failure to comply with Fed. R. Civ. P. 8.  (*See* doc. # 10).  On March 4, 2008,

the Tenth Circuit Court of Appeals reversed and remanded.  *Toevs v. Reid*, 267 Fed.

Appx. 817 (10th Cir. (Colo.) 2008).  Without seeking leave, on May 14, 2008 Mr. Toevs

filed a Second Amended Complaint (*see* doc. # 65), which he voluntarily withdrew on

June 19, 2008.  (*See* Courtroom Minutes/Minute Order (doc. # 73)).  Thus, the

operative pleading is the Amended Complaint (doc. # 7).

In his Amended Complaint, Mr. Toevs alleges five claims for relief: (1) that

Defendants deprived him of property without due process, (2) which resulted in cruel

and unusual punishment and in (3) the denial of access to published material; (4) that

he was "subjected to retaliatory action for exercising my right to file grievances and

pursue legal action;" and (5) that he was "deprived of liberty without due process by

being kept segregated from General Population (G.P.) without periodic meaningful

reviews. . . ."  (*See* doc. # 7 at p. 4 of 28).  Mr. Toevs alleges that Defendant Reid

"acted as Warden to enact and authorize policies which deny due process and allow

retaliation" and that his "signature is on AR 850-06 and OM 650-100 which authorized

the deprivation and destruction of my property without due process."  (*See* doc. # 7 at

pp. 2, 6, 9, 10, 14, 17 of 28). Mr. Toevs alleges that Defendant Morris "used her capacity as Property Sgt to deprive me of property without due process and to retaliate for filing grievances" and "initiated the process which resulted in my property being destroyed without due process." (See doc. # 7 at pp. 2, 6, 9, 10, 14 of 28). Mr. Toevs alleges that Defendant Troxel "initiated a proceeding which denied me property in retaliation for filing a grievance" (*see* doc. # 7 at pp. 2, 6, 14 of 28) and that Defendant Moore "used her capacity as case manager to use a staffing to deprive me of property without due process in retaliation for filing a grievance." (*See* doc. # 7 at pp. 3, 5, 6, 14 of 28). Mr. Toevs alleges that Defendant Ortiz "signed into effect Administrative Regulations which authorize deprivation of property without due process and hold him responsible for any denial of due process in the administrative segregation process." (*See* doc. # 7 at pp. 3, 6, 9, 17 of 28). As relief, Mr. Toevs seeks "compensatory damages," "punitive damages," costs, fees, and injunctive relief in the form of modification of the Colorado Department of Corrections ("CDOC") Operational Memorandum ("OM") 650-100 and Administrative Regulation ("AR") 600-02 and prohibition of retaliation. (*See* doc. # 7 at p. 23 of 28). All of the Defendants have moved to dismiss or for summary judgment for several reasons, including qualified immunity, pursuant to Fed. R. Civ. P. 12(b)(6), 12(b)(1), and 56.[1]

---

[1] On July 1, 2008, the court authorized Mr. Toevs to serve discovery limited to the issue of qualified immunity. (*See* Courtroom Minutes/Minute Order (doc. # 78); *Crawford-El v. Britton*, 523 U.S. 574, 598 (invocation of defense of qualified immunity is not a bar to all discovery).

II.    Standard of Review

Under Rule 12(b)(1), a motion to dismiss may be granted if the court does not have subject matter jurisdiction over the matter.  In addressing a jurisdictional challenge, the court need not presume all of the allegations contained in the complaint to be true, "but has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts. . . ."  *United States v. Rodriguez Aguirre*, 264 F.3d 1195, 1204 (10th Cir. 2001) (citation omitted).

Rule 12(b)(6) states that a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  To withstand a motion to dismiss, a complaint must contain enough allegations of fact "to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1974 (2007).  The burden is on the plaintiff to frame "a complaint with enough factual matter (taken as true) to suggest" that he or she is entitled to relief.  *Twombly*, 127 S.Ct. at 1965.  "Factual allegations must be enough to raise a right to relief above the speculative level."  *Id*.

> We review the grant of summary judgment de novo, applying the same standard the district court should apply under Fed.R.Civ.P. 56(c).  For dispositive issues on which the plaintiff will bear the burden of proof at trial, he must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [his] case in order to survive summary judgment.  [E]vidence, including testimony, must be based on more than mere speculation, conjecture, or surmise. Unsubstantiated allegations carry no probative weight in summary judgment proceedings.

*Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007) (internal quotations and citations omitted).

Because Mr. Toevs appears *pro se*, the court "review[s] his pleadings and other

papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States Govt*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted). *See also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (holding allegations of a pro se complaint "to less stringent standards than formal pleadings drafted by lawyers"). However, a *pro se* litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991). A court may not assume that a plaintiff can prove facts that have not been alleged, or that a defendant has violated laws in ways that a plaintiff has not alleged. *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983). *See also Whitney v. State of New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (court may not "supply additional factual allegations to round out a plaintiff's complaint"); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) (the court may not "construct arguments or theories for the plaintiff in the absence of any discussion of those issues").

III.    Analysis

A.    Liability of Defendants in their Official Capacities

At a hearing held on July 1, 2008, Mr. Toevs clarified that he is suing Defendants in both their individual capacities and their official capacities. (*See* doc. # 78). To the extent that Mr. Toevs is suing Defendants in their official capacities, he is actually attempting to impose liability on their employer, the State of Colorado. *See Meade v.*

*Grubbs*, 841 F.2d 1512, 1529 (10th Cir. 1988) ("[a] judgment against a public servant in his official capacity imposes liability on the entity he represents"); *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (suit against a state official in his or her official capacity is treated as a suit against the state); *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989) ("a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself").

The Eleventh Amendment provides: "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Absent considerations not present in this case, "the Eleventh Amendment forbids a suit for damages against a state in federal court." *Ambus v. Granite Board of Education*, 995 F.2d 992, 994 (10th Cir. 1993) (citation omitted). The Eleventh Amendment confers total immunity from suit, not merely a defense to liability. *Ambus*, 995 F.2d at 994 (citation omitted). Thus, any claim for money damages brought against Defendants in their official capacities under § 1983 is barred by the Eleventh Amendment and is properly dismissed with prejudice for lack of subject matter jurisdiction. *See Fent v. Oklahoma Water Resources Bd.*, 235 F.3d 553, 559 (10th Cir. 2000) (Eleventh Amendment immunity "constitutes a bar to the exercise of federal subject matter jurisdiction").[2]

---

[2]    The Eleventh Amendment does not bar claims for prospective equitable relief based on alleged unconstitutional actions of state officials. *See Ex parte Young*, 209 U.S. 123 (1908). *See also ANR Pipeline*, 150 F.3d 1178, 1188 (10th Cir. 1998) ( "when an official of a state agency is sued in his official capacity for prospective equitable

B.     Liability of Defendants in their Individual Capacities

The Eleventh Amendment does not bar actions for damages against state

officials in their individual capacities.  *Kentucky v. Graham*, 473 U.S. 159, 164 (1985).

To the extent that Mr. Toevs is suing Defendants in their individual capacities, personal

capacity suits pursuant to § 1983 seek to impose personal liability upon a government

official for actions he or she takes under color of state law.  *Graham*, 473 U.S. at 165-

67.  Title 42 U.S.C. § 1983 creates a cause of action where a  "person . . . under color

of any statute, ordinance, regulation, custom or usage, of any State . . . subjects, or

causes to be subjected, any citizen of the United States or other person . . . to the

deprivation of any rights, privileges or immunities secured by the Constitution."  Section

1983 does not create any substantive rights; rather, it creates only a remedy for

---

relief, he is generally not regarded as 'the state' for purposes of the Eleventh
Amendment and the case may proceed in federal court."), *overruled on other grounds
by Hill v. Kemp*, 478 F.3d 1236, 1259 (10th Cir. 2007).  However, the Tenth Circuit has
outlined the following exceptions to the *Ex parte Young* doctrine:

> First, federal courts have no jurisdiction to entertain a suit that seeks to
> require the state official to comply with state law-only allegations of
> violations of federal law are sufficient to come within the Ex parte Young
> rule . . . . Second, the doctrine will not go so far as to allow federal
> jurisdiction over a suit that seeks to redress past wrongs-only ongoing
> violations are covered . . . . Third, the doctrine does not allow a federal
> court to declare past state conduct unconstitutional when the only purpose
> for such a declaratory judgment would be its res judicata effect in a
> subsequent state-court proceeding; such a declaration would have the
> effect of adjudicating the liability issues in a damages action against the
> state even though a direct federal suit for damages would be barred by
> the Eleventh Amendment. And fourth, although the doctrine will allow
> injunctive relief that might have a substantial ancillary effect on a state
> treasury, it does not allow an award for monetary relief that is the practical
> equivalent of money damages, even if this relief is characterized as
> equitable.

*Id*. at 1188-1189 (internal citations omitted).

violations of rights secured by federal statutory and constitutional law. *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 616-18 (1979). To establish a claim under § 1983, a plaintiff must prove he was deprived of a right secured by the Constitution or laws of the United States and that the alleged deprivation was committed under color of law. *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).

C.      Qualified Immunity

Defendants raise the defense of qualified immunity. Whether Defendants are entitled to qualified immunity is a legal question. *Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007), *cert. denied*, 128 S.Ct. 1229 (2008). When a defendant seeks summary judgment on the basis of qualified immunity, the plaintiff must establish that the defendant violated a constitutional right. *Williams v. Berney*, 519 F.3d 1216, 1219 (10th Cir. 2008) (citation omitted). In determining whether a constitutional violation occurred, the court must view "the facts in the light most favorable to the plaintiff." *Kelley v. City of Albuquerque*, 542 F.3d 802, 821 (10th Cir. 2008). The plaintiff must also show that the constitutional right was clearly established. *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1204 (10th Cir. 2008), *cert. denied*, 129 S.Ct. 1003 (2009). "If the [defendant]'s conduct did not violate a constitutional right, the inquiry ends and the [defendant] is entitled to qualified immunity." *Wilder*, 490 F.3d at 813 (citation omitted).[3]

_____

[3]     While it will often be appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation occurred and then determining whether the constitutional right was clearly established, the order of those analytical steps is no longer mandatory. *See Pearson v. Callahan*, ___ U.S. ___, 2009 WL 128768, at *9 (Jan. 21, 2009) (overruling *Saucier v. Katz*, 533 U.S. 194 (2001)).

D.    Due Process Claims

Mr. Toevs alleges that he was deprived of his property and liberty without due process in violation of the Fourteenth Amendment.  (*See* doc. # 7 at pp. 5-6, 15-17 of 28).  In Claim One, Mr. Toevs alleges that Defendants deprived him of personal property, "including shoes, sweats, thermals, magazines, books, and canteen items" without due process when he was placed in the Quality of Life Level Program ("QLLP"). (*See* doc. # 7 at p. 5 of 28).  In Claim Five, Mr. Toevs alleges that he was "deprived of liberty without due process by being kept segregated from General Population (G.P.) without periodic meaningful reviews. . . ."  (*See* doc. # 7 at pp. 4, 15-17 of 28).

At all times relevant to this action, Mr. Toevs was a prisoner in the custody of the CDOC, where he had been "subject to the Quality of Life Level Program (QLLP) a form of Administrative Segregation (Ad Seg) in the Colorado State Penitentiary (CSP) and Centennial Correction Facility (CCF) since 3/04/02."  (*See* doc. # 7 at p. 4 of 28).  The QLLP is "[a] stratified incentive based program based on behavior and program participation consisting of levels one thru six."  (*See* OM 650-100, IV.D. (doc. # 81-2) at p. 2 of 16).  QLLP '[i]ncentives are privileges which are earned based strictly on appropriate behavior and program compliance."  (*See id.*).  Prisoners placed in the administrative segregation's QLLP system must progress through six levels of classification before they can be returned to the general population.  (*See id.*;  Affidavit of Sgt. Morris (doc. # 81-3) at ¶ 5).  In September 2005, Mr. Toevs was "reduced in level from level 6 to 1."  (*See* doc. # 7 at p. 5 of 28).  On February 23, 2006, Mr. Toevs received notice informing him that pursuant to AR 850-06 governing offender property

he had ten days to complete a form indicating how he wanted his property disposed. (*See id.*; *see also* doc. # 81-3 at ¶ 12). On February 27, 2006, Mr. Toevs filed a grievance numbered CF05106-340 "requesting that the property be stored until disposition of the grievance and any possible court action." (*See* doc. # 7 at p. 6 of 28). In late March 2006, Mr. Toevs received notice that his property had been destroyed. *Id*.


      1.     Property

"The Fourteenth Amendment provides that no state shall 'deprive any person of life, liberty, or property, without due process of law.' " *Estate of DiMarco v. Wyoming Dept. of Corrections*, 473 F.3d 1334, 1339 (10th Cir. 2007) (quoting U.S. Const. Amend. XIV). "A due process claim under the Fourteenth Amendment can only be maintained where there exists a constitutionally cognizable liberty or property interest with which the state has interfered." *Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006) (citation omitted). The Tenth Circuit Court of Appeals has ruled that property interest and liberty interest claims by prisoners are "to be reviewed under *Sandin's* atypical-and-significant-deprivation analysis." *Steffey*, 461 F.3d at 1221 (citing *Cosco v. Uphoff*, 195 F.3d 1221, 1224 (10th Cir.1999) (other citations omitted). "The Supreme Court mandate since *Sandin* is that henceforth we are to review property and liberty interest claims arising from prison conditions by asking whether the prison condition complained of presents 'the type of atypical, significant deprivation in which a State might conceivably create a liberty [or property] interest.' " *Cosco*, 195 F.3d at 1224 (alteration in original, quoting *Sandin v. Conner*, 515 U.S. 472, 486 (1995)).

Mr. Toevs' allegations of deprivation of his property items do not state a valid claim.  "The regulation of type and quantity of individual possession" in prison cells reflects a typical type of restraint imposed on the prison population.  *See Cosco*, 195 F.3d at 1224 (permanent separation of an inmate from his property does not amount to an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life).  Courts have repeatedly held that it is not unreasonable for a prison to restrict the amount of material inmates in administrative segregation may have in their cells at any one time.  *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("We must accord substantial deference to the professional judgment of prison administrators, who bear significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them");  *In re Long Term Administrative Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 469 (4th Cir. 1999) ("Prison officials 'should be accorded wide-ranging deference in adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'") (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979));  *Maberry v. McKune*, 24 F. Supp. 2d 1222, 1228-1229 (D. Kan. 1998) (regulation which imposed quantity and value limitations on property which inmates were allowed to possess did not violate equal protection or due process).  Mr. Toevs fails to state a due process claim for deprivation of his property items.

2.      Liberty

Mr. Toevs further alleges that the "degree of restriction" in the QLLP Program

deprived him of his liberty interest without due process in violation of the Fourteenth Amendment. While he acknowledges that periodic reviews of his Administrative Segregation status were conducted, he alleges that "from 8/03 to 1/05" and "[f]rom 9/05 to filing this complaint I've received reviews which all say the same thing, . . . from 2/05 to 8/05 I received no reviews whatsoever," that "[r]eviews which say the same thing are a denial of due process," and that "none of these reviews have any meaning anyway because none could have secured my release to G.P." (*See* doc. # 7 at p. 16 of 28).

Prisoners do not have a constitutionally recognized liberty interest in their security classification or placement. *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983) ("the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence."); *Meachum v. Fano*, 427 U.S. 215, 228 (1976) ("Whatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all."); *Templeman v. Gunter*, 16 F.3d 367, 369 (10th Cir. 1994) (Colorado laws and regulations do not entitle inmates to remain in the general population absent certain conduct); *Frazier v. Dubois*, 922 F.2d 560, 561-62 (10th Cir. 1990) ("a prisoner enjoys no constitutional right to remain in a particular institution and generally is not entitled to due process protections prior to such a transfer. . . .").

In *Sandin*, the Supreme Court held that an inmate's liberty interest is protected under the Due Process Clause if the restraints or conditions imposed "atypical and

significant hardship on the inmate in relation to the ordinary incidents of prison life."
515 U.S. at 484. *See also Steffey*, 461 F.3d at 1221 ("the Supreme Court held that a deprivation occasioned by prison conditions or a prison regulation does not reach protected liberty interest status and require procedural due process protection unless it imposes an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' ") (quoting *Sandin*, 515 U.S. at 484). "[T]he touchstone of the inquiry . . . is not the language of regulations regarding those conditions but the nature of those conditions themselves in relation to the ordinary incidents of prison life." *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005) (internal quotation marks and citation omitted). Whether confinement "conditions impose such an atypical and significant hardship that a liberty interest exists is a legal determination. . . ." *Beverati v. Smith*, 120 F.3d 500, 503 (4th Cir. 1997) (citing *Sandin*, 515 U.S. at 485-87).

The Tenth Circuit has identified relevant factors to consider when determining whether placement in administrative segregation implicates a protected liberty interest: (1) whether "the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) [whether] the conditions of placement are extreme; (3) [whether] the placement increases the duration of confinement . . . ; and (4) [whether] the placement is indeterminate." *DiMarco*, 473 F.3d at 1342. "[A]ny assessment must be mindful of the primary management role of prison officials who should be free from second-guessing or micro-management from the federal courts." *DiMarco*, 473 F.3d at 1342 (citation omitted).

Here, at least three of the relevant factors weigh against an enforceable liberty

interest. Based on Mr. Toevs' allegations, his placement in the QLLP related to and furthered a legitimate penological interest such as safety or rehabilitation by responding to his negative attitude and behavior. Mr. Toevs has not alleged that his placement increased the duration of his confinement. Nor were the conditions atypical or extreme. *See Penrod v. Zavaras*, 94 F.3d 1399, 1406 (10th Cir. 1996) (Tenth Circuit has explicitly held that "the transfer of an inmate to less amenable and more restrictive quarters for non-punitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence.") (internal quotation marks and citation omitted); *Talley v. Hesse*, 91 F.3d 1411, 1413 (10th Cir. 1996) ("In *Sandin*, the Court held that the plaintiff's discipline in segregated confinement was not the sort of atypical, significant deprivation that would give rise to a liberty interest entitled to due process protection.") (citation omitted). Mr. Toevs' allegations of restricted out-of-cell time, exercise, educational classes, "chow hall," and other privileges fail to rise to denial of access to any "basic essentials of life" or a condition that is sufficiently atypical or significant in relation to the ordinary incidents of prison life to implicate a liberty interest. *See DiMarco*, 473 F.3d at 1343 (inmate had access to the basic essentials of life, although her access to certain amenities was more limited than the general population); *Fiorentino v. Biershbach*, 64 Fed. Appx. 550, 552 (7th Cir. (Ill.) April 9, 2003) (segregated confinement "to a cell nearly 24 hours a day" and deprivation "of various rights and privileges enjoyed by the general prison population such as smoking, watching TV, listening to the radio, using the telephone, accessing the law library, and participating in recreational and religious programs. . . did not constitute an atypical, significant deprivation that would create a liberty interest protected by due process");

14

*Blum v. Federal Bureau of Prisons*, 189 F.3d 477 at * 3 (10th Cir. (Colo.) Aug. 23, 1999) (disciplinary segregation that left inmate "without store privileges, radio, phone calls, etc. that other inmates just being held in segregation had the privileges of" was "not different in such degree and duration as compared with the ordinary incidents of prison life to be a protected liberty interest under the Due Process Clause") (internal quotation marks citations omitted); *McCoy v. Denning*, 2006 WL 1360121 at * 4 (D. Kan. May 17, 2006) (segregation where inmate allowed only "one visiting day, one hour of recreation, restricted commissary, no t.v., no radio, and other privileges that are restricted" did not allege conditions significantly more restrictive or atypical than "to be normally expected by one serving a jail term") (internal quotation marks and citation omitted).[4]  "The prison has no constitutional duty to equalize these type of amenities in every detail. Nor does a prisoner have a right to access every type of program available to other inmates, ranging from work to recreation." *DiMarco*, 473 F.3d at 1343.

As to whether Mr. Toevs' placement in the QLLP is indeterminate, he alleges that he has been in the QLLP "over 1700 consecutive days." (*See* doc. # 7 at p. 15 of 28).  While "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard, *Jenkins v. Haubert*, 179 F.3d 19, 28 (2d Cir.1999), confinement in administrative segregation for a period of 1700 days may constitute atypical and significant restraint deserving due process protections.  *See Trujillo v. Williams*, 465 F.3d 1210, 1225 (10th Cir. 2006) (allegation of 750 days spent in segregation "may itself be atypical and significant"); *Sims v. Artuz*, 230 F.3d 14, 23 (2d

---

[4]    Copies of all unpublished cases cited are attached to this Memorandum Opinion and Order.

Cir. 2000) (stating that confinement in SHU exceeding 305 days was atypical); *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000) (prisoner's almost eight years in administrative custody was "atypical").

The next question is what process is due. *See Wilkinson*, 545 U.S. at 224, 125 S.Ct. 2384 (applying framework established in *Mathews v. Eldridge*, 424 U.S. 319 (1976)). Due process requires no more than the 30-day review procedure that Mr. Toevs alleges he has received. *See Rahman X v. Morgan*, 300 F.3d 970, 973-74 (8th Cir. 2002) (reconsideration of housing assignment every 60 days constituted sufficient due process); *Jones v. Mabry*, 723 F.2d 590, 594 (8th Cir. 1983) (due process requires procedure for periodic review of administrative segregation status); *Hunt v. Sapien*, 480 F. Supp. 2d 1271, 1277 (D. Kan.) (placement was not indefinite where reviewed weekly for the first 60 days, and subsequently reviewed monthly, after 180 days, and annually), *reconsideration denied*, 2007 WL 1520906 (D. Kan. 2007); *DiMarco*, 473 F.3d at 1343 (due process satisfied where placement was reviewed every 90 days). AR No. 600-02 indicates that "the status of an offender who had a classification hearing which resulted in assignment to administrative segregation shall be reviewed" on a regular and frequent basis. (*See* doc. # 81-6 at p. 9 of 15).

Mr. Toevs claims that he was denied due process because the periodic reviews of his QLLP status were meaningless proceedings and that "from 2/05 to 8/05 I received no reviews whatsoever." (*See* doc. # 7 at p. 16 of 28; *see also* p. 21 of 28 ("Claim 5 stems from the fact that I've received 30 day Ad Seg reviews which say the same thing for years at a time.")). Defendants have not addressed in their Motion or

Reply Mr. Toevs' due process claim based on his liberty interest. The court concludes that there remains an unresolved fact issue on this record as to whether Mr. Toevs actually received meaningful reviews of his administrative segregation status, rather than sham reviews, as he contends. *See Kelly v. Brewer*, 525 F.2d 394, 400 (8th Cir. 1975) ("where an inmate is held in segregation for a prolonged or indefinite period of time due process requires that his situation be reviewed periodically in meaningful way . . ."); *McClary v. Coughlin*, 87 F. Supp. 2d 205, 214 (W.D.N.Y. 2000) ("a fundamental requirement of all due process is that it be 'meaningful' and not a sham or a fraud") (citation omitted). *See also Brooks v. DiFasi*, 112 F.3d 46, 49 (2d Cir. 1997) (due to the length of confinement, court must engage in a fact-specific inquiry to determine whether it constitutes an "atypical and significant hardship" under *Sandin*).

In sum, Mr. Toevs' allegations based on the restrictions associated with the QLLP program do not state a valid claim. Mr. Toevs' allegations of the differences between general population restrictions and the QLLP restrictions (*see* doc. # 7 at p. 15 of 28) fail to rise to a condition that is sufficiently atypical or significant in relation to the ordinary incidents of prison life to implicate a liberty interest. However, because Mr. Toevs has alleged placement in the QLLP for more than 1700 days with a lack of meaningful periodic reviews, he may state a claim for atypical and significant restraint deserving due process protections in the form of meaningful periodic reviews of his administrative segregation status. Mr. Toevs' Claim Five may proceed as to whether he received meaningful periodic reviews of his continued placement in the QLLP.

E.     Cruel and Unusual Punishment

In Claim Two, Mr. Toevs alleges that the deprivation of his property without due process resulted in cruel and unusual punishment in violation of his Eighth Amendment rights because his exercise regimen was adversely affected by the lack of tennis shoes and thermal underwear.  (*See* doc. # 7 at pp. 7-9 of 28; *see also* doc. # 7 at p. 18 of 20 ("Claims 1, 2, and 3 all stem from the deprivation and destruction of my property.")).  To the extent that Mr. Toevs' claim is based on the deprivation of his property, the court has already determined that he has not stated a claim for violation of due process.

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citation omitted).  The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. CONST. Amend. VIII.  Certain conditions of confinement, if they inflict pain unnecessarily and wantonly, may constitute cruel and unusual punishment under the Eighth Amendment.  *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

An Eighth Amendment claim includes both an objective component, whether the deprivation of a basic human need is sufficiently serious, and a subjective component, whether the officials acted with a sufficiently culpable state of mind.  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  As for the objective component, "extreme deprivations" are required to make out a conditions-of-confinement claim.  *Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992).  Thus, in a conditions-of-confinement case, a "sufficiently serious" deprivation is shown when "a prison official's act or omission . . . result[s] in the denial

of 'the minimal civilized measure of life's necessities.'" *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  The subjective component follows from the principle that "'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'"  *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 297).  The "deliberate indifference" subjective standard requires a showing that the defendant "knows of and disregards an excessive risk to inmate health or safety."  *Farmer*, 511 U.S. at 837.  Under this standard, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.

While the Tenth Circuit Court of Appeals "and other courts have recognized, some form of regular outdoor exercise is extremely important to the psychological and physical well being of inmates," *see Perkins v. Kansas Dept. of Corrections*, 165 F.3d 803, 810 (10th Cir. 1999) ("Although we have never expressly held that prisoners have a constitutional right to exercise, there can be no doubt that total denial of exercise for an extended period of time would constitute cruel and unusual punishment prohibited by the Eighth Amendment.") (internal quotation marks and citations omitted), Mr. Toevs does not allege total denial of out-of-cell exercise.  Rather, he alleges that without his tennis shoes and thermal underwear he must exercise "without the proper footwear," in "thin canvas slip on shoes" or barefoot and in cold temperatures in a short-sleeved shirt and pants "made of lightweight material."  (*See* doc. # 7 at pp. 8, 9 of 28).  As to the objective component of an Eighth Amendment claim, Mr. Toevs' allegations do not state a claim for deprivation "of the minimal measure of life's necessities," as required to

state a claim upon which relief can be granted pursuant to the Eighth Amendment.  See

*Petway v. Lappin*, 2008 U.S. Dist. LEXIS 17061 (N.D. Va. 2008) (plaintiff's complaint

that he was required to wear shower shoes and form-fitting clothing did not constitute

cruel and unusual punishment and thus failed to state an Eighth Amendment claim

concerning the conditions of his confinement in administrative segregation);  *Nelson v.*

*CA. Dept. of Corrections*, 2004 U.S. Dist. LEXIS 4521 (N.D. Ca.) (court granted

judgment as matter of law on claim of inadequate clothing for outdoor exercise);

*Jackson v. Kantola*, 110 F.3d 64 (6th Cir. 1997) (plaintiff's constitutional rights were not

violated by the alleged lack of appropriate exercise clothing) (quoting *Sandin*, 515 U.S.

at 486;  *Munoz v. Marshall*, 1994 U.S. Dist. LEXIS 12755 (N.D. Ca.) ("While there is no

doubt that athletic footwear may be more comfortable than the state-issued footwear,

the failure to permit inmates to wear the most comfortable apparel does not rise to a

violation of the Eighth Amendment.").  The conditions which Mr. Toevs alleges, the lack

of tennis shoes and thermal underwear for exercising, do not rise to the serious level

implicating a violation of his Eighth Amendment rights.

As to the subjective component, Mr. Rosales has not alleged that the responsible

prison officials acted with "deliberate indifference."  Mr. Toevs has not alleged that

Defendants were deliberately indifferent to any risk of harm.  *See Farmer*, 511 U.S. at

837 ("the official must both be aware of facts from which the inference could be drawn

that a substantial risk of serious harm exists, and he must also draw the inference").

Further, Mr. Toevs' allegations are too vague and conclusory to state a claim upon

which relief can be granted.  Mr. Toevs has not specifically alleged how many days he

exercised, for what period of time, what dates, or what weather conditions existed, leaving his allegations conclusory.  Mr. Toevs' allegations are not adequate to state an Eighth Amendment violation.


F.     Book and Magazines

In Claim Three, Mr. Toevs alleges that the deprivation of his property without due process resulted in "denial of access to published material" in violation of his First Amendment rights because he was deprived of "one book and three magazines."  (*See* doc. # 7 at p. 10 of 28;  *see also* doc. # 7 at p. 18 of 20 ("Claims 1, 2, and 3 all stem from the deprivation and destruction of my property.")).  Mr. Toevs alleges that prison regulations permitted only two books and two magazines when he was at levels 5 and 6 of the QLLP while he had been permitted five books and six magazines when he was at levels of the QLLP.  (*See id.*).

To the extent that Mr. Toevs' claim is based on the deprivation of his property, the court has already determined that he has not stated a claim for violation of due process.  A prisoner retains all First Amendment rights that are "not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  *Pell v. Procunier*, 417 U.S. 817, 822 (1974).  Nevertheless, merely because prisoners "retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations . . . ."  *Bell v. Wolfish*, 441 U.S. at 545-46. Prisoners' First Amendment rights "may be curtailed whenever the institution's officials in the exercise of their informed discretion, reasonably conclude that such [rights] . . . possess the likelihood of disruption to prison order or stability, or otherwise interfere

21

with the legitimate penological objectives of the prison environment." *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 132 (1977). *See also Thornburgh v. Abbott*, 490 U.S. 401, 409 (1989) (relevant inquiry is whether the actions of prison officials were "reasonably related to legitimate penological interests") (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1974)).

In order to determine if a regulation is "reasonably related to legitimate penological interests," courts look to whether the regulation is rationally related to a legitimate and neutral government objective, whether there are alternative avenues that remain open to the inmates to exercise the right, the impact that accommodating the asserted right would have on other guards and prisoners and on the allocation of prison resources, and whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials. *Turner*, 482 U.S. at 89-90. Courts owe "substantial deference to the professional judgment of prison administrators." *Overton*, 539 U.S. at 132. The burden is on the prisoner to disprove the validity of the prison regulations at issue. *Id*.

Mr. Toevs has not been deprived of all books and magazines. He is merely allowed fewer books and magazines at one level of the QLLP than are allowed in another level. Mr. Toevs has only conclusorily alleged but failed to show that the limitation on the number of books and magazines in administrative segregation is not reasonably related to a legitimate penological interest under the standard of *Turner* and its progeny. (*See* doc. # 7 at p. 10 of 28). As a justification for the limitation on the number of books and magazines permitted in administrative segregation, Defendants

set forth the need to motivate better behavior on the part of prisoners who have demonstrated the necessity of holding them in the rigorous regime of confinement of the QLLP. (*See* doc. # 81-2). This rationale itself satisfies the *Turner* requirements. *See Beard v. Banks*, 548 U.S. 521, 528-33 (2006) "We need go no further than the first justification, that of providing increased incentives for better prison behavior." *See also Overton*, 539 U.S. at 134 (upholding a prison's "severe" restriction on visitation privileges as "a proper and even necessary management technique to induce compliance with the rules of inmate behavior, especially for high-security prisoners who have few other privileges to lose."); *Neal v. Lewis*, 414 F.3d 1244, 1248 (10th Cir. 2005) (defendants did not violate plaintiff's "First Amendment rights simply by enforcing a prison regulation limiting the number of books he could keep in his cell."); *Gregory v. Auger*, 768 F.2d 287, 290 (8th Cir. 1985) (restrictions on certain types of correspondence, including junk mail, newspapers and magazines serve a legitimate penological objective of "deterrence of future infractions of prison rules"); *Daigre v. Maggio*, 719 F.2d 1310, 1313 (5th Cir. 1983) ("To promote the important government interest in maintaining discipline, officials must have available sanctions that impose incremental disadvantages on those already imprisoned."); *Savko v. Rollins*, 749 F. Supp. 1403, 1409 (D. Md. 1990) (limitation on the amount of in-cell religious reading material was constitutional under *Turner* standards). Mr. Toevs fails to state or demonstrate a claim for violation of his First Amendment rights.

G.     Retaliation

In Claim Four, Mr. Toevs alleges that he was "subjected to retaliatory action for exercising my right to file grievances and pursue legal action." (*See* doc. # 7 at pp. 4, 11-14 of 28).  Defendants argue that this claim is barred by the Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), for failure to exhaust administrative remedies.

Prior to filing this civil action, Mr. Toevs was required to exhaust administrative remedies pursuant to the PLRA.  *Booth v. Churner*, 532 U.S. 731, 741 (2001).  Section 1997e(a) provides:

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

"There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."  *Jones v. Bock*, 549 U.S. 199, 211 (2007).  The PLRA requires "proper exhaustion" of administrative remedies, which means the plaintiff must utilize all administrative remedies provided and must comply with the deadlines and other procedural rules prior to filing a federal lawsuit relating to the conditions of his confinement.  *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).  *See also Jones v. Bock*, 549 U.S. at 218 ("to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules, – rules that are defined not by the PLRA, but by the prison grievance process itself") (internal quotation marks and citation omitted).  "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' "  *Jones*, 549 U.S. at 218.  "The level of detail necessary in a

grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

Prior to *Jones v. Bock*, 549 U.S. at 199, the Tenth Circuit interpreted the PLRA as imposing "a pleading requirement." *Steele v. Federal Bureau of Prisons*, 355 F.3d 1204, 1210 (10th Cir. 2003), *abrogated,* 549 U.S. at 199. "The Supreme Court recently rejected our rule in *Steele*, however, and set forth a new standard to govern PLRA lawsuits: 'failure to exhaust is an affirmative defense under the PLRA, and . . . inmates are not required to specially plead or demonstrate exhaustion in their complaints.' " *Roberts v. Barreras*, 484 F.3d 1236, 1240 (10th Cir. 2007) (quoting *Jones v. Bock*, 549 U.S. at 216 and citing *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223 (10th Cir. 2007)). Now "the burden of proof for the exhaustion of administrative remedies in a suit governed by the PLRA lies with the defendant." *Roberts v. Barreras*, 484 F.3d at 1241. Defendants bear the burden of proof and must provide conclusive evidence establishing the affirmative defense of failure to exhaust. *See e.g., Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) ("if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor").

The grievance process for prisoners in the custody of the CDOC is set forth in AR 850-04. (*See* doc. # 81-7; *see also* Affidavit of Anthony DeCesaro (doc. # 81-8) at ¶ 4). Under 850-04.IV., CDOC inmates are required to attempt to resolve any issue or

complaint they have by filing a Step 1 grievance form. (*See* doc. # 81-8 at ¶ 6). An inmate who is not satisfied with the result of the Step 1 grievance must then proceed to file a Step 2 grievance. (*See id*.). If the inmate is still unsatisfied with the response to his Step 2 grievance, he must then proceed to file a Step 3 grievance. (*See id*. at ¶ 8). The Step 3 grievance is the final step in the CDOC grievance process, and only once the inmate receives a response at this Step has he exhausted his administrative remedies. (*See id*. at ¶ 9). The decision of the grievance officer is the final agency action. (*See id*.). A substantive issue may not be added at a later step if it has not been contained in each previous step of that particular grievance. (*See* AR 850-04.IV.B.3.b (doc. # 81-7)). To properly exhaust CDOC procedures, all issues and remedies must be incorporated into each step of the grievance." (*See id*.). The court may take judicial notice of the CDOC's administrative process. *See Ray v. Aztec Well Service Co.*, 748 F.2d 888, 889 (10th Cir. 1984) (court can take judicial notice of agency rules and regulations); *Antonelli v. Ralston*, 609 F.2d 340, 341, n. 1 (8th Cir.1979) (judicial notice taken of Bureau of Prisons' Program Statement).

Defendants have presented evidence that Mr. Toevs failed to exhaust this claim. Mr. Toevs filed a Step 1 grievance in DOC Grievance Number CF 05106-340 concerning a notice he was given directing him to elect the manner in which he wished his contraband property to be disposed of. (*See* doc. # 81-8 at ¶ 11, *see also* p. 5 of 6). This grievance was denied, and on April 4, 2006, Mr. Toevs filed his Step 2 grievance requesting that confiscated property be returned to him, or stored until he could be allowed to regain the right to it. (*See* doc. # 81-8 at ¶ 11, *see also* p. 6 of 6).

Alternatively, he requested $150, the "approximate value of the confiscated property." (*See* doc. # 81-8 at p. 6 of 6).  Mr. Toevs filed a Step 3 grievance on May 4, 2006 alleging for the first time that his "regressive move to CSP from CCF was clearly retaliatory for filing a grievance," in addition to a request that he be "reimbursed for the property that was wrongfully taken from me without due process." (*See* doc. # 81-8 at ¶ 11, *see also* p. 4 of 6).  The record indicates that Mr. Toevs has never filed a Step 1 or Step 2 grievance alleging that his move from CCF to CSP was done in retaliation for filing a grievance. (*See* doc. # 81-8 at ¶11).  Since Mr. Toevs did not raise retaliation in his Step 1 or Step 2 grievances, raising it for the first time in his Step 3 grievance, this claim was not properly raised or exhausted within the CDOC grievance procedure. (*See, e.g.*, doc. # 81-8 at ¶ 12).

Mr. Toevs attaches to his Response (doc. # 88) a copy of Grievance No. CS06/07-632 to demonstrate that he raised the specific issue of retaliation through the grievance process.  (*See* doc. # 88 at pp. 8-12 of 13).  Mr. Toevs commenced this action on August 14, 2006 by filing a Complaint which asserted, *inter alia*, a claim for retaliation.  On January 24, 2007, i.e. more than five months later, he initiated his internal administrative grievance alleging that "since August of 2005 I have been subjected to repeated retaliation for exercising my protected rights".  (*See* doc. # 88 at p. 9 of 13).  Thus, his claim for retaliation was filed before he utilized the prison administrative process and may properly be dismissed as premature.  His administrative grievance filed 17 months after the alleged retaliatory conduct occurred (*see* doc. # 88 at p. 9 of 13) was untimely given that AR 850-04 IV. D. a. 1) requires the

filing of a Step 1 grievance no later than 30 calendar days from the date the offender

knew, or should have known, of the facts giving rise to the grievance. (*See* doc # 81-7

at p. 8 of 18).  Since Mr. Toevs did not properly exhaust his claim of retaliation within

the CDOC administrative process, the PLRA compels dismissal of his Claim Four.


IV.     Conclusion

        As Mr. Toevs has failed to state or demonstrate a claim upon which relief can be

granted as to Claims One, Two, and Three, Defendants are entitled to qualified

immunity as to those claims.  As Mr. Toevs has failed to exhaust his administrative

remedies regarding his Claim Four, Defendants are entitled to summary judgment as to

that claim.  Mr. Toevs' Claim Five may proceed as to whether he received procedural

due process in the form of meaningful periodic reviews of his continued placement in

the QLLP.[5]


        Accordingly, IT IS ORDERED that:

        1.     The "State Defendants' Motion to Dismiss or for Summary Judgment"

(filed July 31, 2008) (doc. # 81) is DENIED IN PART to the extent that Mr. Toevs has

stated a claim in Claim Five against Defendant Ortiz for violation of due process based

on whether he received meaningful reviews of his continued QLLP confinement and

GRANTED IN PART as to all other claims alleged and Defendants named in the

---

[5]      To the extent that Mr. Toevs alleges that Defendants violated prison regulations,
the "failure to adhere to administrative regulations does not equate to a constitutional
violation." *Hovater v. Robinson*, 1 F.3d 1063, 1068 n. 4 (10th Cir. 1993).

Amended Complaint (doc. # 7).

     2.     **A Preliminary Scheduling Conference shall be held on Thursday**

**April 30, 2009 at 9:15 a.m.**, in Courtroom A-402, Fourth Floor, of the Alfred A. Arraj

U.S. Courthouse, 901 19th Street, Denver, Colorado. The parties need not comply with

the requirements of Fed. R. Civ. P. 16 and D.C. COLO L.CIVR. 16.2 and 26.1. The

purpose of the initial conference is to consider the nature and status of the case, the

timing for filing of any motions, and what discovery, if any, will be needed.  Mr. Toevs or

his case manager shall arrange for his participation via telephone and shall call (303)

844-2117 at the scheduled time.

     DATED at Denver, Colorado, this 6th day of March, 2009.

                                   BY THE COURT:


                                __s/Craig B. Shaffer_____
                                United States Magistrate Judge